IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Matthew Kirchhoff, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20 C 50242 |
| | ) | |
| vs. | ) | |
| | ) | Judge Philip G. Reinhard |
| Chem Processing, Inc. | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

For the reasons stated below, defendant's motion for summary judgment is granted as to plaintiff's claims under the ADA, granted as to the claim under the FMLA that plaintiff was discouraged from using the FMLA leave he had been granted, denied as to his claim under the FMLA that he was fired for using FMLA leave and denied as to the Illinois retaliatory discharge claim. The parties are directed to contact Magistrate Judge Schneider within 28 days to consider settlement possibilities.

## STATEMENT-OPINION

Plaintiff, Matthew Kirchhoff, brings this action against his former employer, Chem Processing Inc., claiming defendant unlawfully fired him in violation of the Americans with Disabilities Act (42 U.S.C. § 12101, et seq.) ("ADA") (Count II), the Family Medical Leave Act (29 U.S.C. § 2615) ("FMLA") (Count III), and the Illinois common law prohibiting retaliatory discharge (Count I). Subject matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1367. Defendant moves [53] for summary judgment.

The court will first address the federal claims. Plaintiff claims he was disabled within the meaning of the ADA, requested and was granted a reasonable accommodation (a first-floor workstation) to perform his job; that defendant then took away that reasonable accommodation without engaging with plaintiff in the interactive process to find another reasonable accommodation; and that defendant fired him when he objected to the removal of his reasonable accommodation without any effort being made to discuss with him other possible accommodations. Plaintiff's FMLA claims are that he was discouraged by defendant from using the FMLA leave he had been granted and that he was fired for using FMLA leave.

Chad Bertrand was defendant's president. Kenneth James Young was defendant's plant manager. Al Hudson was defendant's maintenance supervisor. Plaintiff was a maintenance technician for defendant. Plaintiff believed Hudson was his direct supervisor, but defendant contends Young was plaintiff's direct supervisor.

Prior to working for defendant, plaintiff had injured his back in a fall from a ladder. He took pain medication for this condition. Plaintiff began working for defendant on April 3, 2018. A year later, on April 5, 2019, plaintiff applied for FMLA leave. Prior to seeking FMLA leave,

plaintiff had been written up for absences. He was given a written warning in November 2018 for absences in October and November 2018.

When he applied for FMLA leave, plaintiff sought intermittent leave. In the Certification of Health Care Provider for Employee Serious Health Condition (Family Medical Leave Act) ("Certification"), submitted pursuant to plaintiff's FMLA leave request, plaintiff's health care provider, Heather Leasure, N.P., identified plaintiff's condition as chronic neck and low back pain, small disc herniation, annular tear at L5-S1 and myofascial back pain relieved by rest. She stated that the condition would cause episodic flare-ups periodically preventing plaintiff from performing his job functions and that it would be medically necessary for him to be absent from work during the flare ups because rest helps relieve plaintiff's myofascial back pain. Dkt # 52-6, p. 92. She estimated the flare-ups would occur once per month and last for 1-2 days. *Id*. According to N.P. Leasure's progress notes of July 16, 2019, plaintiff's pain was constant and aggravated by sitting, standing, walking, long car rides and bending forward. *Id*., p. 48. However, this information in the July 16, 2019 progress notes is not in the Certification. Plaintiff was granted intermittent FMLA leave and took it at various times until his termination. He was never written-up for any absence after being allowed intermittent FMLA leave.

However, plaintiff contends that when he utilized the intermittent leave he had been granted, Hudson told one of plaintiff's co-workers that plaintiff "was on his last leg and digging his own grave, and if he continued calling off, he was going to lose his job." Dkt # 72, p.26, citing Deposition of Shaun Swick, Dkt # 69-4, p. 23 ("I remember Al saying that he was on his last leg and that if he keeps calling off, that he is going to basically lose his job. I mean like Matt was digging his own grave so to speak.") Swick testified he believed Hudson made these comments when plaintiff was taking FMLA time off. Dkt 69-4, p. 23.

Defendant's maintenance department is in the basement of its facility. In or around July 2019, plaintiff relocated his workstation from the basement to the first floor. Plaintiff claims Hudson allowed him to make this move as an accommodation for plaintiff's back pain by providing him relief from going up and down the stairs. Dkt # 68, p. 3; Dkt # 52-4, p. 24. Defendant argues plaintiff moved to the first floor on his own initiative, not because defendant had provided the relocation as a disability accommodation, and that defendant had allowed plaintiff to stay on the first floor until defendant needed the space. Dkt # 74, p. 19.

On September 23, 2019, Young told plaintiff he had to move his stuff back to the basement. Dkt # 68, p. 11. Plaintiff's response to being told to move back to the basement was to say "That ain't going to happen", "it's leaking chemicals down there" and that he was not going to go there. *Id*.[1] Young asked plaintiff to show him where there were active leaks in the basement, and they went to the basement together. Young did not believe the leaks plaintiff

---

[1] Plaintiff denies making this statement in his response to defendant's statement of facts, admitting only that "he said it was unsafe there due to chemicals leaking in the basement." Dkt # 68, p. 11. However, he does not cite to anything in the record that supports his assertion that he only "said it was unsafe there due to chemicals leaking in the basement." His citations in support of his response to defendant's fact paragraph 38 only point to evidence that he moved his stuff to the basement after his interaction with Young. He points to no evidence that contradicts Young's account of what plaintiff said. LR56.1(e)(3) provides that, in its response to a statement of facts, "[t]o dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." Plaintiff has not met this requirement and the court deems defendant's account of plaintiff's statement to Young admitted. LR56.1(e)(3).

2

showed him were active leaks. *Id.*, p.12. Plaintiff told Young he would like to speak with Bertrand about the matter. *Id.*, p. 13. After this interaction with Young, and prior to his termination a couple hours later, plaintiff moved his workstation back to the basement.

Shortly after his interaction with plaintiff, Young went to lunch with Bertrand. He advised Bertrand that plaintiff wished to speak with him, provided Bertrand with a full account of his interaction with plaintiff that morning and recommended plaintiff's employment be terminated. *Id*.

When Bertrand and Young returned from lunch, they met with plaintiff. Bertrand told plaintiff that he was tired of having to work around plaintiff's bad attitude and that he was tired of plaintiff not getting along well with other employees. *Id*. Bertrand advised plaintiff that he had decided to terminate plaintiff's employment based on his insubordination and bad attitude. *Id*., p. 14. Defendant asserts plaintiff admitted during this meeting that he had a bad attitude. *Id*. Plaintiff disputes he agreed he had a bad attitude. *Id*. He asserts that during his deposition he testified that he did not exactly remember how he responded to being asked about having a bad attitude and was neither agreeing nor disagreeing with defendant about this "but believes he did ultimately acknowledge his attitude." *Id*.

On summary judgment, the court gives "the non-moving party, the benefit of conflicting evidence and any favorable inferences that might reasonably be drawn from the evidence. Summary judgment is proper when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. A dispute of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. The substantive law of the dispute determines which facts are material." *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022) (quotation marks and citations omitted). In considering summary judgment, the court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Id.* at 742 (quotation marks and citation omitted).

As an initial matter, plaintiff contends defendant waived any argument against plaintiff's FMLA and ADA retaliation claims. "Retaliation claims under the FMLA and ADA require three familiar elements: (1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action." *Freelain v. Village of Oak Park*, 888 F.3d 895, 900, 901 (7th Cir. 2018).

Plaintiff argues that, as to his FMLA claims, defendant did not make any argument in its opening brief addressing plaintiff's claim that defendant retaliated against him for using FMLA leave when it fired him nor did it make any argument addressing plaintiff's claim that it violated the FMLA's interference provisions by using his leave "as a negative factor in employment actions" when "it fired him, in part, for taking leave." Plaintiff argues this constitutes a waiver of any argument on these issues. Plaintiff contends the only FMLA argument defendant did not waive was on the question whether threats by defendant's maintenance supervisor, Al Hudson, violated the FMLA.

Defendant's opening brief did not address plaintiff's claim his termination was an adverse action taken against him by defendant in retaliation for his use of FMLA leave. Defendant's argument against plaintiff's FMLA claims in its opening brief was that plaintiff never alleged any injury as the result of Hudson's alleged threats because he never alleged, he

3

was denied any leave he requested and "unfulfilled threats are not adverse employment actions." Dkt # 54, p.15.

In its reply, defendant contends it did not waive any argument against plaintiff's claim he was fired for using FMLA leave. It contends plaintiff's complaint "does not separate Defendant's alleged interference with Plaintiff's FMLA from Defendant's alleged retaliation against Plaintiff in connection with FMLA leave." Dkt # 74, p. 22. However, in its order [28] denying defendant's motion to dismiss, the court found plaintiff had stated a claim for relief under an FMLA retaliation theory where his use of FMLA leave was the statutorily protected activity, his termination was the adverse employment action and his use of FMLA leave was the cause of his termination. Defendant's opening brief did not address plaintiff's claim that he was terminated in retaliation for using FMLA leave. It only argued plaintiff did not allege he was ever denied any FMLA leave he requested. Defendant has waived, for purposes of summary judgment, any argument in opposition to plaintiff's claim he was terminated in retaliation for using FMLA leave.

Plaintiff also argues defendant has waived any argument in opposition to his ADA retaliation claim. However, defendant's opening brief argued that "without knowledge of Plaintiff's disability, Defendant could not possibly have fired defendant 'because of' his disability, as the ADA requires for liability to attach." Dkt # 54, p. 11. Defendant's opening brief, therefore, based on defendant's lack of knowledge of plaintiff's disability, did challenge plaintiff's claim that he was fired in retaliation for exercising his rights under the ADA so the issue must be addressed on the merits.

<u>FMLA</u>

Plaintiff argues Hudson's comments set forth above, discouraged him from taking the intermittent FMLA leave he had been granted. Defendant argues plaintiff does not have an FMLA claim because it never denied a request by plaintiff for intermittent FMLA leave. Therefore, Hudson's threats were unfulfilled and unfulfilled threats are not adverse employment actions. Defendant is incorrect.

"[D]enial of FMLA benefits is *not* required to demonstrate an FMLA interference violation. Interference or restraint alone is enough to establish a violation, and a remedy is available under [29 U.S.C. § 2617] if the plaintiff can show prejudice from the violation." *Ziccarelli v. Dart*, 35 F.4th 1079, 1089 (7th Cir. 2022) (emphasis in original). "Threatening to discipline an employee for seeking or using FMLA leave to which he is entitled clearly qualifies as interference with FMLA rights." *Id.* at 1090. However, to recover for a violation of the FMLA's interference provision (29 U.S.C. § 2615(a)(1)), plaintiff must also show he was prejudiced by defendant's unlawful actions. *Ziccarelli v. Dart*, 35 F.4th at 1089.

Plaintiff asserts in paragraph 49 of his statement of facts that because of the comments by Hudson that plaintiff was going to lose his job if he kept calling off, plaintiff "did not take additional leave days he was entitled to." Dkt # 72, p. 26. However, he does not cite to any evidence in the record that supports the assertion Hudson's comments discouraged him from taking leave he was entitled to take. Plaintiff cites to his deposition where he testifies there were times when he had flare-ups but felt "compelled to stay there" because he "felt guilty taking a day off because of what they needed." Dkt # 52-4, p.19. His other citations in paragraph 49 concern Hudson's comments themselves. None of the citations support the statement that

4

Hudson's comments caused him not to take leave he was entitled to take. Plaintiff does not cite to any other evidence to support his claim that Hudson's comments caused him not to take leave to which he was entitled. Without such evidence, defendant is entitled to summary judgment on plaintiff's interference claim based on Hudson's comments.[2]

ADA

Defendant argues plaintiff was not disabled within the meaning of the ADA; was granted the only accommodation he ever asked for (intermittent leave); that plaintiff moved his workstation to the first floor unilaterally - not as the result of a request to defendant for such a move as a reasonable accommodation for his disability; that plaintiff never asked for a first floor workstation as an accommodation; that granting plaintiff a first floor workstation would have imposed an undue hardship on defendant; and that plaintiff was fired for his "bad attitude" and insubordination not for asking to keep his workstation on the first floor as an accommodation for his disability.

"Section 12112(a) of the ADA prohibits employers from discriminating 'against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.' 42 U.S.C. § 12112(a)." *Brooks v. Avencez*, 39 F.4th 424, 433 (7th Cir. 2022). To prove a violation of § 12112(a), plaintiff must show (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) he suffered an adverse employment action; and (4) the adverse action was caused by his disability. *Id.*

The term disability as relevant to this case, "means, with respect to an individual--(A) a physical or mental impairment that substantially limits one or more major life activities of such individual," 42 U.S.C. § 12102(1)(A), and "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication." 42 U.S.C. § 12102(4)(E)(i)(I).

"An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication." 42 U.S.C. § 12102(4)(E)(i)(I).

N.P. Leasure's Certification, submitted for plaintiff's FMLA application, describes plaintiff's condition and states that the condition would cause episodic flare-ups preventing plaintiff from performing his job functions. A reasonable jury could find from this evidence plaintiff is disabled under the ADA because the major life activity of working is substantially

---

[2] Because the lack of evidence that plaintiff did not take leave to which he was entitled due to Hudson's comments resolves this claim, the court need not decide whether Hudson's comments were a violation by defendant of the FMLA's interference provision (29 U.S.C. § 2615(a)(1)).

limited during the condition's episodic flare-ups. Plaintiff was granted intermittent FMLA leave based on the Certification, so defendant was aware of the contents of the Certification and, therefore, of plaintiff's disability.

Plaintiff argues defendant violated the ADA by failing to reasonably accommodate his disability and by firing him in retaliation for invoking his right to a reasonable accommodation. To establish a claim for failure to accommodate, plaintiff must show that: (1) he is a qualified individual with a disability; (2) defendant was aware of his disability; and (3) defendant failed to reasonably accommodate his disability. *Preddie v. Bartholomew Consolidated School Corp.*, 799 F.3d 806, 813 (7th Cir. 2015). A qualified individual with a disability is an individual who, with or without a reasonable accommodation can perform the essential functions of his job. *Id.*

There is no dispute that plaintiff could perform the essential functions of his job. Defendant contends that even if plaintiff was disabled, which it disputes, that plaintiff did not need, nor ever asked for, any accommodation other than intermittent FMLA leave, which he was granted and utilized, to perform the essential functions of his job. Plaintiff argues that defendant (through Hudson) allowed him to move his workstation to the first floors as an accommodation for his disability but then removed the accommodation without discussing alternative accommodations.

While plaintiff presents evidence that he was allowed to relocate his workstation to the first floor, he does not cite any evidence that he asked defendant to accommodate his disability by allowing him to move to the first floor or that defendant allowed him to relocate as an accommodation for his disability. Plaintiff cites paragraph 51 of his statement of facts as supporting his claim that he made constant requests to Hudson to relocate his workstation to the first floor because going up and down the stairs exacerbated the pain in his back. However, paragraph 51 cites plaintiff's deposition testimony where he testified that it "was almost a daily conversation between Al and I of why maintenance wasn't on the first floor." Dkt 52-4, p. 23. When asked if he meant the entire maintenance department having a spot on the first floor, he responded: "Not just a spot but maybe a substation kind of where we could keep some tools, some parts, and do some work instead of going up and down the stairs all the time." *Id.* He also cites Swick's deposition where Swick was asked "Did you ever talk to Matt Kirchhoff about why he moved his toolbox up to that area?" and Swick responded "It's because the up and down the stairs was bothering his back. And he had complained of chemicals dripping on him while he was sitting by the toolbox." Dkt 69-4, p. 13.

His brief also cites his response to paragraph 8 of defendant's statement of facts. His paragraph 8 response states that defendant "placed a maintenance box and welding station upstairs and, [defendant] and Hudson eventually allowed Kirchhoff to move upstairs and that resulted in relief for his back and to be free from chemical drips." Dkt # 68, p. 3. To support this response he cites Bertrand's deposition, where Bertrand answers "correct" to the question "Mr. Kirchhoff was allowed to work upstairs on the main floor for a while, right?" He also cites Hudson's deposition where Hudson testified that at some point defendant had put a maintenance box and a welding station upstairs to be able to do small repairs and that plaintiff moved up to that station in July 2019. Dkt 52-3, p. 9. He also cites his own deposition where he testified that Hudson had let him move to the first floor and Bertrand provided the toolbox and welder. Dkt # 52-4, p. 24. When plaintiff was asked "what were you trying to accomplish by doing that" he

responded, "provide relief from going up and down the stairs constantly, for my back pain, for staying out of the basement drips." *Id.*

While this evidence may show that plaintiff intended his move to the first floor to alleviate his back pain (and to avoid chemical drips in the basement), it does not show he ever asked for a first-floor workstation as an accommodation for his disability nor does it show defendant moved plaintiff to a first-floor workstation as an accommodation for his disability. "[A] plaintiff typically must *request* an accommodation for his disability in order to claim that he was improperly *denied* an accommodation under the ADA." *Preddie,* 799 F.3d at 813. The record simply does not support plaintiff's assertion that his workstation was moved to the first floor as an accommodation for his disability.

Likewise, the record does not show that plaintiff asked that his workstation be left on the first floor as an accommodation. When Young told plaintiff to move back to the basement, according to plaintiff's response to paragraph 38 of defendant's statement of facts, plaintiff told him "it was unsafe there due to chemicals leaking in the basement." Dkt # 68, p. 11. While plaintiff's statement of facts paragraph 56 says he proposed to Young places on the first floor where his workstation could have been relocated, he does not assert he told Young he was seeking an accommodation for his disability. Dkt # 69, p. 9.

Plaintiff argues he was fired for opposing the recission of his accommodation of a first-floor workstation without any discussion of alternative accommodations. However, since he has failed to present evidence that his move to the first floor was an accommodation for his disability or that he asked to keep his workstation on the first floor as an accommodation for his disability, he has failed to present evidence his termination was because of his disability. He has presented no evidence his termination was in any way related to his disability.

Plaintiff also claims his termination violated the ADA because it was in retaliation for his protected activity. As noted above, defendant argued in its opening brief that because it lacked knowledge of plaintiff's disability, it could not have fired him because of his disability. Dkt # 54, p. 11. As discussed above, a reasonable jury could conclude from N.P. Leasure's Certification submitted with plaintiff's FMLA application that plaintiff was disabled within the meaning of the ADA and that defendant was aware plaintiff was disabled based on the information contained in the Certification. Therefore, defendant is not entitled to summary judgment on the ADA retaliation claim on the basis it lacked knowledge of plaintiff's disability. Additionally, the ADA retaliation provisions protect individuals even if they are not "qualified individuals with a disability" under the ADA. *Rodrigo v. Carle Foundation Hospital*, 879 F.3d 236,243 (7th Cir. 2018). If plaintiff engaged in protected activity under the ADA, which caused an adverse employment action, he would be protected whether he was disabled or not.

However, plaintiff claims the protected activity he engaged in, which caused his termination, was his asking for the accommodation of a first-floor workstation or his objection to being required to return his workstation to the basement. As just discussed, he has not presented evidence that his termination was caused by a request for, or complaint about a recission of, a first-floor workstation as an accommodation for his disability. His retaliation claim is foreclosed.

Illinois Retaliatory Discharge

Plaintiff claims he was fired "because he opposed unsafe working conditions caused by persistent chemical leaks into the facility's basement." Dkt # 67, p. 6. Plaintiff's job duties included repairing leaks. In the morning of September 23, 2019, the day he was fired, plaintiff took a photo of a document he received which indicated something was leaking into the basement.[3] Later, after Young told him to move his stuff back to the basement, but before he was fired, plaintiff told Hudson he intended to file an OSHA complaint over the noon hour because he thought the basement was unsafe. Dkt # 69, p. 4, par. 20.[4]

Hudson saw Bertrand, Young, and Matt Smazik, defendant's operations manager, leaving the building and told them plaintiff needed to talk to them. *Id.*, par. 21. Hudson denies he told Bertrand and Young about plaintiff's threat to call OSHA. *Id.* The same morning, around 11:15 or 11:30, plaintiff told Ed Gamon, defendant's environmental health and safety manager: "What does somebody gotta do around here, call OSHA to keep things safe?" *Id.*, par. 23. Gamon said he would pass the comment along to Young. *Id.*, p. 5, par. 24. Young told Bertrand during their lunch that plaintiff complained that the basement was unsafe because he was being dripped on and that plaintiff believed there to be chemical leaks. *Id.*, par. 25. Plaintiff was fired when Young and Bertrand returned from lunch.

Previously, on August 30, 2019, OSHA issued defendant a formal notice that it had a "serious" violation and proposed a $8,525 penalty relating to training employees with respect to hazardous chemicals after its workers "were exposed to burns and skin irritation hazards." *Id.*, p.3, par. 12. Shortly thereafter, in September 2019, another employee, Paul Foster, filed an OSHA complaint after chromic acid ate through a copper pipe and landed on his forehead in the basement about 15 feet from where plaintiff worked. *Id.*, par. 13. Chrome had been leaking in Foster's work area (the lower basement) for approximately two months and he complained internally. *Id.*, par. 14. Defendant had been working on getting parts to stop leaks in the chrome room for a long time, but it had not been done. *Id.*, par. 15. On September 26, 2019, following Foster's OSHA complaint (and a few days after firing plaintiff), defendant finally got a proposal from a contractor to replace all the chrome fume hoods which the contractor determined to be the root cause of the leak to the basement. *Id.*, pp. 3-4, par. 16. According to Foster, after the repairs were made, the leaks stopped. *Id.*, p. 4, par. 18.

The Illinois tort of retaliatory discharge "is an exception to the general rule that an 'at-will' employment is terminable at any time for any or no cause." *Rehfield v. Diocese of Joliet*, 182 N.E.3d 123, 132 (Ill. 2021) (quotation marks and citation omitted). The exception provides that "an employer may not discharge an employee if a clear mandate of public policy is

---

[3] During his deposition, plaintiff was questioned about a document which included "operator's name, Paul; 9/23/19; Location 53" and "Paul's getting something leaked into the basement from end of 53, maybe coming from exhaust." It also included a picture of a watch showing a time of 7:56. Plaintiff was asked "What am I looking at here?" He responded, "I believe that was to document that there was a leak coming into the basement on the day I was terminated" and testified he had taken this photo before he had been terminated. See Dkt # 68, p. 12, par. 39 response, citing Dkt # 52-4, p. 30, deposition page 146: 5-13.

[4] Plaintiff cites paragraph 20 of Hudson's affidavit (Dkt # 69-5) to support this fact. Paragraph 20 of Hudson's affidavit states: "later that morning I observed Mr. Kirchhoff packing his tools from the floor area he was occupying. Mr. Kirchhoff told me that he was being required to move back downstairs. I asked Mr. Kirchhoff if he was quitting his job, and Mr. Kirchhoff responded that he was not, but that he intended to call OSHA over the lunch hour because he felt it was unsafe to work downstairs. He did not tell me why he felt working downstairs was unsafe." Plaintiff also cites Dkt # 52-4, his own deposition, pages 157:5-17. However, page 157 of his deposition is not included in Dkt # 52-4. Dkt # 52-4 does not include pages 154-157.

involved." *Michael v. Precision Alliance Group, LLC.*, 21 N.E.3d 1183, 1188 (Ill. 2014). Illinois allows retaliatory discharge actions "in two settings: where an employee is discharged for filing, or in anticipation of filing, a [workers' compensation claim] or where an employee is discharged in retaliation for reporting of illegal or improper conduct, otherwise known as 'whistleblowing'." *Id*. To win a retaliatory discharge case, a plaintiff must prove he was (1) discharged (2) in retaliation for his activities and that (3) the discharge violates a clear mandate of public policy. *Id*. "The requirement that the discharge be in retaliation for plaintiff's activities requires that a plaintiff establish a causal relationship between the employee's activities and the discharge." *Id*. An employer is not required to give a reason for the discharge but may choose to offer a reason if it desires. *Id.* at 1189. If the employer offers "a valid, nonpretextual basis for discharging its employees and the trier of fact believes it, the causation element required to be proven is not met." *Id*. (quotation marks and citation omitted). Plaintiff bears the burden to prove each element of the claim. *Id*.

"To survive a motion for summary judgment on an Illinois retaliatory discharge claim, a plaintiff must have offered sufficient evidence for a jury to find that (1) the employer discharged the employee (2) in retaliation for the employee's protected activities, and (3) that the discharge was in contravention of a clearly mandated public policy." *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir. 2014). "Retaliation claims under Illinois law differ from federal retaliation claims under the *McDonnell Douglas* framework, where a plaintiff can present a *prima facie* case and shift the burden to the defendant to provide a legitimate reason for a termination. Instead, Illinois law requires the plaintiff to offer affirmative evidence of causation to survive summary judgment." *Id.* at 587. This evidence will typically be circumstantial. *Id*. The court looks at the record as a whole to see whether a jury could reasonably infer that defendant's motive for firing plaintiff was in retaliation for plaintiff's protected activity. *Id*. The ultimate issue in deciding the element of causation in an Illinois retaliatory discharge case is the employer's motive in discharging the employee. *Hubert v. Board of Education of City of Chicago*, 169 N.E.3d 831, 836 (Ill. App. 2020).

In its opening brief, defendant focuses on plaintiff's statements to Hudson and Gamon about complaining to OSHA as plaintiff's asserted protected activity. Defendant argues plaintiff has not presented evidence that he was discharged for his statements about making an OSHA complaint, because at the time Bertrand fired plaintiff, neither Bertrand nor Young was aware plaintiff had made these statements to Hudson and Gamon. Plaintiff had not previously raised safety concerns about the leaks and did not mention his intention to raise safety concerns with OSHA during the meeting in which he was fired.

Plaintiff argues that it can reasonably be inferred that Bertrand and Young knew plaintiff threatened to call OSHA because Hudson spoke to Bertrand and Young after plaintiff had made the threat to Hudson and before the lunch where Bertrand decided to fire plaintiff. While Hudson testified that he did not tell Bertrand and Young about plaintiff's threat, plaintiff argues "a jury could find otherwise given the highly suspicious circumstances of Plaintiff's termination." Dkt # 67, p.16.

When Young told plaintiff to move to the basement, Plaintiff said it was leaking chemicals in the basement and he was not going to move down there. Shortly thereafter, plaintiff told Hudson he intended to file an OSHA complaint over the noon hour. Hudson then spoke with Young and Bertrand telling them plaintiff needed to talk to them but denies telling them

9

plaintiff said he intended to file an OSHA complaint. Also, around the same time, plaintiff commented to Gamon, "[w]hat does somebody gotta do around here, call OSHA to keep things safe." Gamon said he would pass along plaintiff's comment to Young, but there is no evidence he did so prior to plaintiff's firing. Plaintiff did not recall whether Bertrand or Young mentioned his threats to call OSHA during the meeting in which he was terminated. Dkt # 68, p. 18, par. 64 response. Young and Bertrand both stated they were unaware of plaintiff's threats to complain to OSHA. Dkt # 52, p. 12, par. 65.

Plaintiff has no direct evidence that Bertrand or Young knew of his OSHA threats at the time plaintiff was fired. He relies on the fact Hudson spoke with Young and Bertrand after he made the threat to Hudson as circumstantial evidence from which a jury could conclude, considering that his termination followed shortly thereafter, that Hudson told them of the threat, even though Hudson denies doing so. This evidence is too speculative to support a finding that Bertrand and Young knew plaintiff had threatened to call OSHA shortly before he was fired.

Plaintiff also argues that he was unlawfully fired even if Young and Bertrand did not know about his OSHA threat when Bertrand fired him because they knew he had raised unsafe working conditions shortly before he was fired. Illinois allows retaliatory discharge claims based on discharges arising from raising unsafe working conditions with the employer. *Sherman v. Kraft General Foods, Inc.*, 651 N.E.2d 708, 713 (Ill. App. 1995) (holding retaliatory discharge claim was stated where employee made occupational safety hazard complaint to employer not OSHA), citing, 29 C.F.R. § 1977.9(c) ("salutary principles of the Act would be seriously undermined if employees were discouraged from lodging complaints about occupational safety and health matters with their employers"; good faith complaints made to employers "therefore would be related to the Act, and an employee would be protected against discharge or discrimination caused by a complaint to the employer.")

It is undisputed that Young told Bertrand, during lunch, that plaintiff complained that the basement was unsafe because he was being dripped on by what he believed were chemical leaks and that Young and plaintiff had gone to the basement where plaintiff pointed out leaks. Young did not believe these leaks were active, recommended plaintiff be fired, and Bertrand fired him.

Less than a month earlier, on August 30, 2019, OSHA had issued defendant a formal notice that it had a "serious" violation related to training employees with respect to hazardous chemicals and proposed a $8,525 penalty. Shortly after this OSHA notice, Foster had filed an OSHA complaint after chromic acid ate through a copper pipe and landed on Foster's forehead in the basement about 15 feet from where plaintiff worked. Chrome had been leaking into Foster's work area for approximately two months and he had complained internally.

Thus, at the time Bertrand fired plaintiff, he was aware that plaintiff had said he was not going to relocate to the basement because it was leaking chemicals down there, that defendant had recently been issued a violation notice by OSHA for training issues with respect to hazardous chemicals, and that Foster had filed an OSHA complaint. Plaintiff contends a jury could believe from these facts that defendant wanted to quickly get rid of plaintiff before he filed an OSHA complaint because plaintiff's complaint would corroborate Foster's OSHA complaint.

Defendant refutes this argument contending it fired plaintiff for insubordination and his bad attitude. His insubordination was telling Young "[t]hat ain't going to happen", "it's leaking chemicals down there" and that he was not going to go there, in response to Young telling

plaintiff he had to move his stuff back to the basement. Dkt # 52, P.8, par. 38. Plaintiff stated he was not going to obey Young's direct order. This is a valid ground for termination.

The court's role on a summary judgment motion "is not to evaluate the quality of the evidence or argument, but rather to evaluate whether any evidence exists from which a fact finder could conclude that the party proved the elements of the cause of action." *Hubert*, 169 N.E.3d at 837. In *Hubert*, the court was faced with evidence of insubordination and inappropriate and unprofessional conduct by the terminated employee as well as evidence the employee was acting to investigate seemingly improper behavior by vendors of his employer, the Chicago public schools. The record in *Hubert* contained evidence that could support either a finding by the jury that Hubert was fired for insubordination or that he was fired for his protected activity. The court therefore held summary judgment was inappropriate.

The court here is faced with a similar record. A jury could conclude from the evidence that plaintiff was fired because he complained about the unsafe condition of the basement leaks. There is evidence that there were leaks (the one Foster complained about and the leak in the basement reported the morning of the day plaintiff was terminated). Plaintiff was fired shortly after telling Young that it was leaking chemicals in the basement. The existence of the OSHA violation notice, and the pendency of Foster's OSHA complaint, could be viewed as providing an incentive to try to avoid another OSHA investigation by getting rid of plaintiff.

On the other hand, a jury could simply conclude plaintiff was fired because he said he was not going to obey his superior's order to relocate his workstation. This is a decision the jury must make. The court cannot evaluate the evidence and decide which motive defendant had when it fired plaintiff. Defendant's motion for summary judgment on the Illinois retaliatory discharge claim must be denied.

For the foregoing reasons, defendant's motion for summary judgment is granted as to plaintiff's claims under the ADA, granted as to the claim under the FMLA that plaintiff was discouraged from using the FMLA leave he had been granted, denied as to his claim under the FMLA that he was fired for using FMLA leave and denied as to the Illinois retaliatory discharge claim. The parties are directed to contact Magistrate Judge Schneider within 28 days to consider settlement possibilities.

Date: 1/11/2023     ENTER:

*Philip G. Reinhard*

_____
United States District Court Judge

Electronic Notices.